McDONNELL DOUGLAS CORP. *v*. UNITED STATES

Court No. 72-6-01395

(Decided July 22, 1975)

*Louis Lieber, Jr.* and *B. David Freundlich,* attorneys for the plaintiff.
*Glad, Tuttle & White (Edward N. Glad* of counsel), co-attorneys for the plaintiff.
*Rex. E. Lee,* Assistant Attorney General *(Bernard J. Babb,* trial attorney), for the
   defendant.

RICHARDSON, Judge: This case involves the dutiable status of a
DC-9 jet airplane imported at Los Angeles, California, under its own
power in September, 1968, from Switzerland, and classified in liquida-
tion under TSUS item 694.40 as modified by T.D. 68-9 as "airplanes"
at the duty rate of 9 *per centum ad valorem* which was assessed upon
the full value of the plane. The plaintiff-importer contends in this
action that duty should have been assessed only on the value of the
wings and empennage (tail section) of the plane per force of TSUS
item 804.00, per force of a long established administrative practice
not properly revoked prior to liquidation of the subject entry, per
force of the doctrine of equitable estoppel, and also that a drawback
allowance as applied for should have been paid following the
subsequent exportation of the plane to West Germany.

The issues in this action were tried and submitted on the west
coast before Judge Rao on January 24, 1974 and briefs thereafter
filed by counsel. The chief judge, acting pursuant to rule 2.3(b) of
the rules of this court, reassigned the case to this judge for the purpose
of rendering a decision in the case on the record as submitted. And,
acting pursuant to the reassignment order, this court has read the
transcript of testimony, papers and briefs, and has examined the
evidentiary exhibits in the case.

In the amended pleadings it is admitted, under the first of four
causes of action, that the merchandise in issue consists of a DC-9
airplane, serial number 45787, that the wings and empennage of the
plane were made in Canada of United States aluminum and originally
imported into the United States under a temporary importation
bond as provided for in item 864.05, TSUS, for further processing in
the United States, that the remaining portions of the plane consist
of fabricated components, the product of the United States, and that
after further processing of the wings and empennage and assembly
with the components made in the United States the plane was ex-
ported to Switzerland on June 25, 1967, to cancel the temporary
importation bond covering the wings and empennage. And in the
amended answer the defendant admits that the date of importation
of the plane was September 8, 1968, that the entry papers were re-
ceived on September 10, 1968, that entry was made on September 17,

1968, and that the plane was appraised for customs purposes at $2,902,101.31, net packed.

In issue under the first cause of action is the 12th allegation of the amended complaint that the like articles [not previously exported] to the Canadian-made wings and empennage of the plane had a dutiable value of $401,004.00, and the 17th allegation of said complaint that the plane has not been advanced in value or improved in condition by any process of manufacture or other means while abroad. Under this cause of action, as well as under the second and third causes of action, plaintiff claims that the 9 per cent rate of duty should be assessed only on the value of like wings and empennages not previously exported from the United States.

With respect to the 12th allegation of said complaint, Kenneth Kerr, an accountant and assistant to plaintiff's comptroller, testified at the trial (R. 66):

> Q. I show you Plaintiff's Exhibit 8 for identification and ask [sic] ask you if you are familiar with that?—A. Yes, sir; I am.
>
> Q. How did you become familiar?—A. I directed the putting together of these figures on this statement. This is a cost statement and represents our cost and pricing at our Douglas Aircraft Company plant in Canada.
>
> Q. Did you furnish this statement to U.S. Customs?—A. Yes; I did.

This cost statement was subsequently admitted into evidence as exhibit 8. With respect to the plane in issue the witness testified (R. 69):

> Q. Referring to Plaintiff's Exhibit 8, what do these various ship sets refer to that you have on there?—A. This exhibit reflects the cost element breakdown of the value of airplanes 28 through 200 as it relates—in column 1 here, which is in question, which includes ship 127. . . . It is the cost and pricing that was paid for these wings and subsequently presented to the Bureau of Customs as final pricing.

Exhibit 8 discloses that the final dutiable appraisement value of the wings, empennage, flap, and leading edge was $401,004 for ship sets 28 through 200 which included ship set 127, the one in issue. The witness Kerr also testified that according to studies he made for bank financing purposes he found that the United States content in a DC-9 was over 90 per cent of the aircraft.

With respect to paragraph 17 of the amended complaint, Donald Needle, plaintiff's traffic and customs manager, testified (R. 37-39):

> Q. Did you see the aircraft before it left the United States?—A. I didn't see the aircraft upon exportation.
>
> Q. Did you see it during the time it was being assembled?—A. I have seen it during assembly. I see many airplanes, but I didn't see it at exportation at Long Beach.

Q. When you saw it on its return what was its condition?—A. Its condition was that the original seats that were manufactured into it were not there but a subsequent set of U.S. seats were brought back only as cargo. . . . Also, the tires, as we know, upon importation had been retreaded. And under the entry we were asked to and paid duty on the added value, value added on the U.S. tires that were retreaded.

Q. Were there any other structural changes to this aircraft that you noticed?—A. No, not interiorly.

Q. Or exteriorly?—A. Not upon importation.

The foregoing constitutes the evidence relied upon by the plaintiff under the first cause of action for classification of the plane under TSUS item 804.00.

The applicable statutes read:

[classified]

Aircraft and spacecraft, and parts thereof:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

694. 40　　Airplanes_____ 9% ad val.

[claimed]

Headnote 1, Schedule 8, TSUS:

> 1. . . . except as provided in headnote 3 to part 1 of this schedule, any article which is described in any provision in this schedule is classifiable in said provision if the conditions and requirements thereof and of any applicable regulations are met.

Headnote 1(c), Subpart A, Part 1, Schedule 8, TSUS:

> 1. The items in this subpart (except item 804.00) shall not apply to any article—
>
> 　\*　\*　\*　\*　\*　\*　\*
>
> (c) manufactured or produced in the United States . . . under item 864.05 and exported under any provision of law.

Item 800.00, TSUS:

800. 00　　Products of the United States when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means while abroad_____ Free

Item 804.00, TSUS:

804.00 Articles previously exported from the United States which are excepted from free entry under any of the foregoing items by headnote 1 of this subpart and are not otherwise free of duty_____ A duty (in lieu of any other duty or tax) equal to the sum of any duty and internal-revenue tax imposed upon the importation of like articles not previously exported, but in no case in excess of the sum of any customs drawback proved to have been allowed upon such exportation of the article and any internal-revenue tax imposed, at the time such article is entered, upon the importation of like articles not previously exported.

Headnote 1, Subpart C, Part 5, Schedule 8, TSUS:

1. The articles described in the provisions of this subpart, when not imported for sale or for sale on approval, may be admitted into the United States without the payment of duty, under bond for

their exportation, within 1 year from the date of importation, which period, in the discretion of the Secretary of the Treasury, may be extended, upon application, for one or more further periods which, when added to the initial 1 year, shall not exceed a total of 3 years. . . . For purposes of this headnote, an aircraft engine or propeller, or any part or accessory of either, imported under item 864.05, which is removed physically from the United States as part of an aircraft departing from the United States in international traffic shall be treated as exported.

Item 864.05, TSUS:

| 864.05 | Articles to be repaired, altered, or processed (including processes which result in articles manufactured or produced in the United States)_____ | Free, under bond, as prescribed in headnote 1 |
|---|---|---|

With respect to the evidence presented in support of the first cause of action, plaintiff argues (brief, pp. 10–11):

The wings and empennages involved herein respond to the provisions of Item 804.00, TSUS, as articles previously exported from the United States which are excepted from free entry because they are articles manufactured or produced in the United States under Item 864.05 and exported under any provision of law. The remaining over 90 percent of the DC–9 involved herein does not fall under Item 804.00, TSUS. Instead, being products of the United States which have been returned from abroad without being advanced in value or improved in condition, they should receive free duty treatment under Item 800.00, TSUS.

Therefore, duty as called for under Item 694.40, TSUS, as modified by T.D. 68–9, should have been taken only on the value at which the wings and empennage would have originally been appraised had not a T.I.B. entry been made under Item 864.05, which value was $401,004.00.

To this argument defendant responds (brief, p. 10):

> . . . Plaintiff is not entitled to tariff treatment of the wings and empennage of the imported aircraft under item 804.00, TSUS, as there has been no showing in law that such relief should be granted. The doctrine of constructive segregation, contended by plaintiff to be operative herein to effectuate a separation of foreign-made parts from the United States components, is not applicable to the case at bar, as it has been eliminated by the passage of the Tariff Schedules of the United States.

The court is of the opinion that plaintiff's claim under the first cause of action is not defeated by the asserted demise of the doctrine of constructive segregation. Whatever may be the status of the doctrine of constructive segregation under the TSUS in general, it is clear that insofar as TSUS items 804.00 and 864.05, and headnote 1(c), Subpart A, Part 1, Schedule 8, TSUS, are concerned, Congress contemplated that these provisions should operate in a manner which requires the separation of foreign components of an imported article from its domestic components for classification purposes. The legislative history of the language "(including processes which result in articles manufactured or produced in the United States)" which was added to 19 U.S.C.A., section 1308(1), the predecessor of item 864.05, TSUS, indicates that that language was added expressly to facilitate the importation of foreign airplane parts into this country for the domestic manufacture of airplanes which would then be exported to foreign countries. 1 U.S. Cong. & Adm. News '58, pp. 142–143; 2 U.S. Cong. & Adm. News '58, p. 2451. And the same history indicates that the language "Any article (A) manufactured or produced in the United States . . . under section 308(1) of this Act, and (B) exported under any provision of law . . ." was simultaneously inserted in subparagraph (e)(3) of paragraph 1615 of the Tariff Act of 1930, as amended, the predecessor of headnote 1(c), Subpart A, Part 1, Schedule 8, TSUS, as one of the "conditions designed to safeguard the revenue and the substantive purposes of the Tariff Act" in the event that the foreign article was reimported into the United States. 1 U.S. Cong. & Adm. News '58, p. 143; 2 U.S. Cong. & Adm. News '58, p. 2452.

Hence, it is obvious, in the light of legislative history, that if the foreign part is deemed to be exported from the United States as a component of another article, it was anticipated that the foreign part might subsequently be returned to this country in the same pos-

ture. Such appears to be the construction put upon the predecessor statutes by the customs service. See T.D. 55265(1) wherein free entry was accorded to the American components of a domestically manufactured airplane imported from abroad upon compliance with applicable regulations, while disallowing free entry to the foreign parts incorporated in the plane. And the draftsmen of the Tariff Schedules indicate that no significant changes in substance were intended to be made in these provisions. See Tariff Classification Study, Schedule 8, pp. 12, 79.

What defeats plaintiff's first cause of action in the opinion of the court is its failure to plead and prove compliance with applicable customs regulations in accordance with the requirements of T.D. 55265(1) and headnote 1, Schedule 8, TSUS, inasmuch as plaintiff's claim is, as observed by the trial judge at the outset, a claim for duty exemption for American goods returned to some extent (R. 3).

Headnote 1, Schedule 8, TSUS, which governs claims for duty exemption for American goods returned, among other things, mandates compliance with applicable regulations as a condition precedent to classification under TSUS item 800.00—the tariff provision relied upon by plaintiff under the first cause of action for duty exemption in conjunction with TSUS item 804.00, the dutiable provision for foreign parts. And the regulations affecting classification of American goods returned are contained in section 10.1(a) of the Customs Regulations (19 CFR 10.1(a)). Basically, these regulations require documentation of the American origin of the merchandise on the part of the importer at the time of entry in the form of the filing of (1) the foreign shipper's declaration, (2) the importer's declaration on customs form 3311, and (3) a certificate of exportation on customs form 4467. None of these documents are among the official papers which were received in evidence in this case. And there is no testimony in the record explaining their absence.

In fact, the entry papers reveal that the DC–9 was entered by the customs broker as a *foreign article* under TSUS item 694.40 even though a marginal notation on the entry itself indicates that the entered merchandise was of Canadian and USA origin.[1] As such, the district director merely classified the plane in liquidation as entered. Thus, it appears that the entrant was not even concerned with the requisite documentation for an American goods returned classifica-

---

[1] *Cf. Import Export Service of New Jersey, The Babb Co.* v. *United States*, 37 Cust. Ct. 54, C.D. 1798 (1956) wherein a complete airplane imported from Canada was entered as two separate articles, i.e., a landplane, less engine, and an engine, for purposes of obtaining a duty exemption for the engine as American goods returned, pursuant to paragraph 1615(a), Tariff Act of 1930, as amended.

14

tion—a circumstance which rules out the classic waiver of documentation argument as a factor in the case.

It has long been settled that free entry of merchandise as American goods returned is a privilege which is available to the importer only upon compliance with applicable regulations unless compliance is waived. *Maple Leaf Petroleum, Ltd.* v. *United States,* 25 CCPA 5, T.D. 48976 (1937). In the *Maple Leaf Petroleum* case our appeals court said (pp. 8–9):

> Appellant's argument to the effect that the collector knew all the facts, and that for this reason the establishment of the identity of the merchandise exported and imported in accordance with the regulations was therefore unimportant, is devoid of merit. It has long been the sound policy of our Government that when such grants and privileges as those involved here were allowed in customs matters, they were granted only upon the condition that there should be a compliance with regulations to be prescribed by the Secretary of the Treasury. The party asking the special grant or favor, of course, would be required to make a showing of the essential facts required by the regulation to the collector at the time of entry and not in the way of evidence at some subsequent trail.

Since waiver of documentation is obviously not a factor in this case, it follows that plaintiff's failure to establish compliance with the applicable customs regulations is as fatal to the maintenance of the first cause of action under the TSUS as it would have been under the predecessor 1930 Tariff Act to which the holding in the *Maple Leaf Petroleum* case was addressed. See *George L. Walsh* v. *United States,* 61 Cust. Ct. 252, C.D. 3591 (1968).

Aside from the plaintiff's procedural deficiencies it has not on the record produced evidence to establish that the aircraft exported from the United States to Switzerland is in fact the same aircraft subsequently imported into the United States. Its witness Mr. Needle testified that he was not an engineer, that he did not see the aircraft in its completed condition prior to exportation to Switzerland, and he did not know if there were any repairs requiring replacement while the aircraft was in Switzerland.

With respect to the second cause of action in the amended complaint, plaintiff alleges in substance that the assessment of duty under TSUS item 694.40 upon the full value of the imported DC–9 was contrary to an established, uniform, and still outstanding [2] ad-

---

[2] Outstanding in the sense that there had been no seasonable promulgation of a contrary ruling prior to the entry of the plane in accordance with 19 U.S.C.A. § 1315(d) which states: "No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling; but this provision shall not apply with respect to the imposition of antidumping duties."

ministrative practice of assessing duty only upon the value of the foreign parts of an imported article, the remaining parts of which consist of American products—referring particularly to the ruling of the Commissioner of Customs dated November 18, 1960, and promulgated in 95 Treas. Dec. 492, 493 (T.D. 55265(1)). In the cited ruling the Commissioner states:

> . . . An airplane manufactured in the United States under section 308(1), Tariff Act of 1930, as amended, with the use of a foreign buffet and exported pursuant to section 308(1), is on return precluded from free entry under paragraph 1615(a) of the tariff act by paragraph 1615(e). The parts of such airplane which are of United States manufacture and which following C.D. 1628 may be constructively segregated, may be classified under paragraph 1615(a) with appropriate allowance of duty, upon compliance with the applicable regulations.

In support of this cause of action plaintiff argues in the brief (p.16):

> It is obvious that what was initially exported to Swissair was a brand new passenger DC–9 airplane and what was re-imported into the United States was a used passenger DC–9 airplane. Therefore, the American components in the DC–9 have not been advanced in value or improved in condition while abroad. . . . Therefore, the American components in the involved DC–9 fall squarely within the above ruling [T.D. 55265(1)].

And again, in this connection, plaintiff argues further in the brief (pp.18–19):

> The tariff provisions involved in T.D. 55265(1), *supra,* being paragraph 1615(a), 1615(e) and Section 308(1) of the Tariff Act of 1930, have all been re-enacted without change in item 800.00, item 804.00, item 864.05 and headnote 1(c) of Subpart A, Part 1 of Schedule 8, TSUS. Thus, where the statutory language involved in T.D. 55265(1) has been re-enacted in substantially the same language in TSUS, it can be presumed that Congress adopted this administrative construction. [Citations omitted.]

To this cause of action defendant responds in the brief, among other things (p. 21):

> In the case at bar, not one scintilla of evidence has been offered which would tend to demonstrate an established and uniform practice of allowing free entry of the American-made parts of an aircraft made with foreign-made parts imported under a temporary importation bond upon the aircraft's importation, requiring notice of change of practice. The only thing pointed to by plaintiff is the abstract of the ruling, and beyond that, nothing. . . . In any event, section 315(d) expressly requires that the Secretary *find* such a uniform and established practice before a

notice of change is required, and the Secretary has *not* so found, T.D. 55265(1) being a ruling of *prospective* impact rather than a finding as to *past practice*.

The second cause of action apparently proceeds upon the assumption that the district director was obliged to follow the ruling in T.D. 55265(1) and assess duty only upon the value of the wings and empennage of the imported DC-9 in accordance therewith, upon the mere emergence of facts revealing to him the Canadian origin of the wings and empennage and the domestic origin of the remaining components of the plane, and that his failure to follow this course of action constitutes a *change in practice* within the meaning of section 1315(d). However, the language of T.D. 55265(1) expressly provides that its application is conditioned upon *compliance with the applicable regulations*. And there is no allegation under this cause of action of compliance on the part of plaintiff with section 10.1(a) of the Customs Regulations—the applicable regulation involved in T.D. 55265(1) by virtue of 19 U.S.C.A., section 1201, paragraph 1615(h) (paragraph 1615(h), Tariff Act of 1930, as amended), and one which has been overlooked by plaintiff in its argument. Neither is there any evidence in the record of compliance with this regulation.

Thus, apart from the question of continuity of practice under T.D. 55265(1) [under the TSUS as well as under the predecessor tariff act] which is provoked in defendant's argument [3] that also presupposes an administrative *change in practice* has taken place, the evidence in the record falls short of establishing anything other than a change resulting from plaintiff's inability to invoke application of the existing practice authorized in T.D. 55265(1). Such a change does not constitute a *change in practice* within the meaning of section 1315(d), and, therefore, cannot be the basis for awarding relief to plaintiff under its second cause of action.

With respect to the third cause of action in the amended complaint, plaintiff alleges in substance that the wings and empennage of the imported plane were, upon their original importation into the United States, entered by plaintiff under TSUS item 864.05 in reliance upon the ruling in T.D. 55265(1) in lieu of importation under a drawback entry in which event duty would have been assessed only against the value of the wings and empennage upon reimportation of the plane and not as in this instance upon the full value of the plane, and that

---

*Cf. United States* v. *Edward I. Petow & Son, etc.*, 34 CCPA 55, 64–65, C.A.D. 343 (1946).

by reason of plaintiff's reliance upon T.D. 55265(1) to its detriment defendant is estopped from denying the benefits of T.D. 55265(1) to plaintiff.

At the trial there was received in evidence as exhibit 4 during the testimony of the witness Needle a "Change in Policy" memorandum, dated March 12, 1969, which was distributed by plaintiff to company personnel, and a letter from the company president attached thereto. The letter, also dated March 12, 1969, states:

> An adverse ruling by the U.S. Treasury Department applicable to payment of duty on reimported products containing foreign-made components has imposed an abnormal expense on Douglas Aircraft Company and its customers. The ruling specifically affects the Company's costs in cases where we re-import used airplanes which contain any components made in foreign countries.
>
> To avoid this additional cost, it is necessary to change our method of duty payments to the "drawback" method (dutiable entry) and seek refund for [sic] duty upon exportation through the "drawback" procedure.
>
> The attached document sets forth the policies and procedures to be followed, effective with aircraft numbers DC–8 466 and DC–9 520, and from inception on the DC–10 program.
>
> In the event we are able to obtain administrative relief or retroactive legislature [sic], this policy will be amended at that time.
>
> JACKSON R. McGOWEN,
> *President.*

And on page 1 of the attachment to the letter, under the heading "GENERAL – Import Duty", the following statement appears:

> Policies and procedures applicable to duty on components of our products procured from foreign countries where the imported materials or parts are to be exported as part of an aircraft are based on a "Temporary Import Under Bond" entry basis. This method has effected a savings to the Company as it allows for importation "duty free" of all products that are to be used in manufacturing an end product, where subsequently the end product is to be exported.
>
> Recent Bureau of Customs rulings have been unfavorable from a sales position for foreign customers when components of aircraft initially imported under "Temporary Import Bond" procedure might be re-imported into the United States at a later date. The current Bureau of Customs position on re-imported aircraft

where components have been originally brought into the United States under "Temporary Import Bond," is to assess the aircraft at full value. In order to eliminate the adverse effect on the resale of our products under these prevailing rulings, the draw-back duty method will be used in lieu of the "Temporary Import Under Bond" method on all imported components in accordance with the following . . . .

It is admitted in the amended pleadings under the third cause of action [as well as under the second cause of action], however, that no subsequent ruling changing, modifying, amending, or explaining T.D. 55265(1) has been issued by the Commissioner of Customs by publication in the weekly Treasury Decisions or in the Federal Register. And, according to an internal policy memorandum subsequently distributed within the company, plaintiff reverted to its earlier practice with respect to the importation of foreign aircraft parts under item 864.05 (collective exhibit 3). Collective exhibit 3, dated May 16, 1972, states in part:

Denotes Change
N–New R–Revised

A.  SUMMARY:

This procedure defines responsibilities for handling the importation of material secured from foreign entities and its subsequent exportation.

\*      \*      \*      \*      \*      \*      \*

D.  REGULATIONS:

\*      \*      \*      \*      \*      \*      \*

R

2. All aircraft components, excluding components for military designated aircraft, which are imported from foreign sources and which will become a part of the finished product exported to a foreign country, will be imported under the Temporary Import Bond method. Upon export of the aircraft, the TIB will be lifted.

\*      \*      \*      \*      \*      \*      \*

12. If material which was originally produced in the United States, exported to a foreign country, and not "advanced in value" while there, is brought back into the United States, no duty is payable since this entry represents U.S. goods returned.

\*      \*      \*      \*      \*      \*      \*

F.   REFERENCES:
                1. Authority
                      OMP DAC69-64   Change in Policy – Method
                                      of Receipt on Foreign Com-
                                      ponents

          \*       \*       \*       \*       \*       \*       \*

Jackson R. McGowen
President
Douglas Aircraft Company

In support of the third cause of action plaintiff argues (brief, pp. 21–22):

> The record clearly shows herein that plaintiff was aware to two methods that could be used in importing the unfinished wings and empennage from Canada that were to be finished and incorporated into a DC–9 that was going to be exported to a foreign carrier. . . .
>
>    \*     \*     \*     \*     \*     \*     \*
>
> Relying on the U.S. Customs interpretation, manifest in T.D. 55265(1), plaintiff chose the latter method of importing the wings and empennage in question. If U.S. Customs now adopts the view that there is a radically different result depending upon which method, i.e. drawback or item 864.05, TSUS, was used initially to import the unfinished wings and empennage, it is the duty of U.S. Customs to give notice to the public that T.D. 55265(1) is no longer applicable. Having not done so U.S. Customs cannot take advantage of its failure to act when plaintiff relied on the soundness of T.D. 55265(1). [Citation omitted.]

Defendant argues [reply brief] that the Government made no affirmative misrepresentations, and as such, plaintiff may not rely upon estoppel as a basis for relief.

In the third cause of action plaintiff invokes or attempts to invoke the doctrine of equitable estoppel as a basis for asking affirmative relief from the court. However, it has been recently said by our appeals court that this court lacks the jurisdiction necessary to entertain and award relief predicated upon equitable pleas. See *United States* v. *Torch Manufacturing Co., Inc.*, 62 CCPA 41, C.A.D. 1143 (1975), 509 F. 2d 1187, decided February 13, 1975 [Cust. Bull. Vol. 9, No. 10, page 23, at page 29]; *Quigley & Manard, Inc.* v. *United States*, 61 CCPA 65, 68, C.A.D. 1121, 496 F. 2d 1214 (1974).

But even assuming this court possessed equity jurisdiction it is clear that plaintiff has not made out a case on the instant record for

its application. Although plaintiff has shown reliance upon the ruling in T.D. 55265(1) in making the TIB entries of the foreign-made wings and empennage of the imported DC–9 in lieu of drawback entries, plaintiff has not shown any conduct on the part of the customs service which is inconsistent with the administrative ruling in T.D. 55265(1). It is admitted that the customs service made no formal ruling to countermand its ruling in T.D. 55265(1). And plaintiff has not pleaded or established compliance with the documentation requirements of said ruling in order to induce the customs service to invoke the ruling. Hence, any harm which plaintiff may have sustained by reason of not getting the benefits of T.D. 55265(1) cannot be attributed to conduct on the part of the customs service.

Moreover, while not articulated as such, it would appear that plaintiff's reversion to the TIB method of importing the foreign-made airplane parts following its abandonment of this method in favor of the drawback method is a reflection of its own awareness that the customs service was not the cause of its inability to obtain duty free entry of the parts of the imported DC–9 which are of American origin. For example, when one reads plaintiff's internal memoranda regarding its operating procedures, one notes a discernible lack of discussion or instruction concerning the preparation and filing of customs documents relating to the reimportation of American goods and parts.

For the reasons stated plaintiff cannot succeed in obtaining relief under its third cause of action.

The fourth cause of action in the amended complaint, dealing with a claim for a drawback allowance following the subsequent exportation of the imported DC–9 to West Germany, was the subject of a motion to dismiss on which decision was reserved by the trial judge. At the trial counsel for the defendant stated (R.5–6):

> MR. BABB: Before Mr. Glad proceeds, I have a motion which might go to one of the causes of action here, your Honor. I specifically refer to the fourth cause of action in the complaint, which essentially is plaintiff's claim for drawback here.
>
> As indicated on the drawback entry, your Honor, the drawback entry was liquidated on February 4, 1972. The protest in this case was filed on November 11, 1971. Under the law at that time, your Honor, the protest was required to be filed within a certain period after liquidation. And in this particular case the protest was filed before.
>
> I submit, therefore, the court has no jurisdiction to entertain the fourth cause of action, and accordingly, I move to dismiss the fourth cause of action in this case on the grounds that the protest, which is material to the jurisdiction of the court, is premature.

And in its brief defendant states, among other things (p. 27):

> It may be argued, as it was at trial, that the consumption entry herein shows the following in red ink, "(Drawback disallowed – tent. liq. 9–1–70) M.L."; that this was the official act of denying the drawback claim; and that the protest was filed, therefore, after the liquidation of the drawback entry. Defendant submits, assuming, *arguendo*, that this was the drawback liquidation, that the protest then is filed too late as it was required to be filed within 90 days after drawback was denied. If September 1, 1970 is to be considered the date of the drawback entry liquidation, the protest filed on November 11, 1971, is untimely also, and this cause of action should be dismissed.

Plaintiff did not respond to these particular arguments advanced by the defendant, either at the trial or in its briefs.

Examination of the official papers indicates that the chronology of events are as stated by defendant in its motion. The drawback entry received in evidence as exhibit A discloses that drawback entry No. 125927 filed at Los Angeles on September 8, 1969, was liquidated February 4, 1972 – "Disallowed Drawback Rate applies to parts only Aug 31 1970". And although the consumption entry notes that this disposition was a tentative liquidation as of September 1, 1970, it is clear that it is a *final liquidation* and not a *preliminary one* which sets into motion a statute of limitations governing the filing of a protest against the collector's refusal of a drawback claim. See *E. Fucini & Co., Inc.* v. *United States*, 4 Cust. Ct. 174, C.D. 317 (1940).

In the *Fucini* case, the first division of this court said (p. 178):

> The provisions for judicial review of administrative action provided by section 514 of the Tariff Act of 1930 are to be liberally construed to effect its main purpose and the time limitation for beginning suit thereunder is not to be applied artificially. Therefore, under the peculiar circumstances arising here which were outside the control of the plaintiff, a partial liquidation made by the collector upon an incomplete report to him by other officials is not to be construed as the final liquidation from which protest lies, but, upon a fuller, accurate report by the other officials to the collector of customs of additional taxes levied and paid while the goods were still in the plaintiff's warehouse, the filing of a new drawback entry to cover such excess is proper, and protest against the collector's refusal to refund such excess if made within 60 days after such subsequent refusal will be timely.

The plaintiff in this case had not filed a protest against the earlier and partial liquidation which was said by the Government to be final and conclusive against the plaintiff.

Inasmuch as the final liquidation of the drawback claim in the instant case took place on February 4, 1972, the protest filed November 11, 1971, on which the fourth cause of action rests, is premature insofar as the drawback claim is concerned since it was not filed within 90 days after liquidation as required by 19 U.S.C.A., section 1514(b)(2)(A) (section 514(b)(2)(A), Tariff Act of 1930, as amended by the Customs Administrative Act of 1970). As such, the court agrees with defendant that the court is without jurisdiction to entertain the fourth cause of action. Defendant's motion to dismiss the fourth cause of action is granted, and said cause of action is hereby dismissed.

Plaintiff having failed to sustain any of its causes of action for the reasons stated herein, this action must be dismissed. Judgment will be entered accordingly.

## COLECO INDUSTRIES, INC. *v.* UNITED STATES

(Dated August 15, 1975)

*Siegel, Mandell & Davidson* (*Brian S. Goldstein* of counsel) for the plaintiff.
*Rex E. Lee,* Assistant Attorney General (*Frank J. Desiderio,* trial attorney), for the defendant.

MALETZ, Judge: The question in these cross-motions for summary judgment is the proper tariff classification of a game called "Decision Football" that was imported from Canada via the port of Champlain, New York in 1972. Examination of the pleadings and an affidavit of plaintiff's corporate director of engineering establishes that there is no genuine issue of fact to be tried—and the parties so agree.

The customs decision complained of is the classification of the importation under item 734.15 of the tariff schedules, as modified by T.D. 68–9, with duty assessed at the rate of 10 percent ad valorem. More specifically, item 734.15, as thus modified, provides in part:

> Chess, checkers, pachisi, backgammon, darts, and other games played on boards of special design, all the foregoing games and parts thereof (including their boards); * * *_____      10% ad val.